UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| UNITED STATES OF AMERICA | |
|---|---|
| | CRIMINAL ACTION |
| VERSUS | |
| | NO. 18-51-JWD-RLB |
| DAVID JEROME SMITH | |

## RULING AND ORDER

This matter comes before the Court on the Motion to Suppress Evidence (Doc. 25) filed by Defendant David Jerome Smith. The Government opposes the motion. (Doc. 28). On September 5, 2018, the Court held an evidentiary hearing. The parties then submitted post-hearing briefs (Docs. 33, 37 & 38). After careful consideration of the parties' arguments, the facts in the record, and the applicable law, and for the following reasons, the defendant's motion (Doc. 25) is denied.

### I. FACTUAL BACKGROUND

**A. Overview**

On February 9, 2018, a security officer at the Cortana Mall in Baton Rouge, Louisiana, called the Baton Rouge Police Department ("BRPD") and informed the dispatcher that a customer reported seeing a black male with a black jacket "waving" a firearm outside a mall entrance and concealed it in his pants before entering the mall. (Doc. 30, Ex. 1). An eyewitness also called 911 and reported that the suspect was wearing black and white sneakers, sagging pants, and gray underwear. (Doc. 30, Exs. 2-A & 2-B). The witness overheard the subject "say something about robbing." (*Id.*). BRPD officers were dispatched to the mall. (Transcript of September 5, 2018 Hearing ("Tr.") at 19–24).

Upon arrival, officers were informed that "[t]here was a guy outside of the mall waving a gun talking about robbing something," and that the subject was wearing "sagging pants, grey

underwear, and black and white Nike shoes." (Tr. at 24 & 41). After entering the mall, a security guard informed the officers that the suspect was in Sam's Jewelry Store. (*Id.* at 27). Officers proceeded to the jewelry store and saw a person standing at the counter who matched the description of the suspect provided by mall security and the eyewitness. (*Id.* at 27–28). At this point, officers detained the defendant and discovered "a loaded Smith and Wesson 9mm pistol concealed in his waistband" (Doc. 28 at 2; Tr. at 42–43).

### B. Calls to Police Dispatch

At the September 5, 2018 evidentiary hearing, the Government introduced recordings of two separate calls to BRPD on February 9, 2018. One call was placed by mall security to BRPD dispatch and stated that a customer reported seeing a black male wearing a black jacket "waving" a gun near once of the Cortana Mall entrances. (Doc. 30, Ex. 1). The Government introduced two other recordings of a 911 call placed by the eyewitness, who stated that she saw a black male wearing black and white Nike sneakers, sagging pants, gray underwear waving a gun near Entrance 3. (Doc. 30, Exs. 2A & 2B). The caller also stated that she heard the suspect say "something about robbing."[1] (Doc. 30, Ex. 2B).

### A. Officers' Response

#### i. Transmission of Information

BRPD Officer Antonio Williams ("Officer Williams") testified at the hearing that he was one of the officers who responded to the Cortana Mall on February 9. Officer Williams provided testimony regarding the information-sharing procedure between BRPD dispatchers and its officers. Dispatchers typically share information with officers through the use of two-way radios

---

[1] In its post-hearing brief, the Government asserts that it introduced the phone call in separate recordings to avoid revealing the caller's identity, and that the caller identified herself at the end of the call. (*See* Doc. 33 at 2 n.1).

and by messaging the officers on the Computer Aided Dispatch ("CAD") systems in their police vehicles. (Tr. at 13–14).

On February 9, Officer Williams received a CAD message from dispatch for a Code Three situation at the Cortana Mall. (Tr. at 18–19). A Code Three is the highest designation given to a call and requires officers to "use lights and sirens [and] get to the call immediately." (*Id.* at 19). Code Three calls are urgent "[b]ecause there may be a weapon involved or a possible life-threatening occurrence there." (*Id.*). For Code Three calls, multiple officers must respond and at least two officers are required to enter a building. (*Id.* at 19 & 32). The first entry on Officer Williams' CAD system at 12:38 pm stated that mall security reported a "subject waving a gun, entrance three." (*Id.* at 22). That message was followed by a request for backup officers and a supervisor. (*Id.*). Next, at 12:39, a message stated that mall security was looking for the subject, who was wearing a black jacket. (*Id.*). At 12:43, a message stated that a female witness went to the mall's security office and reported seeing a "male wearing black and white Air Nikes, sagging pants, gray underwear showing, [and] was outside." (*Id.* at 23). The subject was with another male and the eyewitness heard "them say something about robbing, [but] she didn't get the whole statement made." (*Id.*). At 12:46, mall security informed BRPD that the subject was possibly in Sam's Jewelry Store. (*Id.*).

As Officer Williams was arriving at the mall at 12:43, he possessed this information in addition to information transmitted over his two-way radio. (Tr. at 23 & 34). Thus, before he entered the mall, he was aware of "a guy outside of the mall waving a gun talking about robbing something" and a physical description of the subject. (*Id.* at 24).

3

### ii. Arrest

At the hearing, the Government introduced video footage of the incident from Officer Williams' body camera. The clip began with Officer Williams and two other officers entering the mall "methodically and slowly." (Tr. at 27). As officers moved through the mall, they encountered a security guard who informed them that the suspect was in Sam's Jewelry Store. (*Id.*). Officers proceeded to the jewelry store and encountered three men at the counter, one of whom matched the physical description of the suspect. (*Id.* at 27–28). Officer Williams did not know for sure that Smith had a gun, but believed he did based on the eyewitness report. (*Id.* at 28). The video showed three males at the jewelry store counter with their backs to the officers. While officers directed the three to raise their hands, Smith hesitated and did not immediately comply. Thereafter, Smith raised his hands and officers patted him down, discovering a firearm in his waistband. They then placed Smith under arrest without a warrant after determining that he was a convicted felon.

### D. Testimony of Officer Williams

Officer Williams testified at the evidentiary hearing that, despite the report of a male waving a gun and mentioning a "robbery" outside the mall entrance, he did not automatically believe there was a robbery occurring when he entered the mall with his fellow officers. (Tr. at 31). He also testified that it may or may not be against the law to possess a firearm at a mall. (*Id.* at 33 & 41). According to Officer Williams, officers entered the mall with their weapons drawn because they had information that there may be a person with a firearm and "a possible robbery." (*Id.*). While Officer Williams did not see the CAD message about a possible robbery because he had already entered the mall, he heard the information as it was transmitted through his fellow officers' two-way radios. (*Id.* at 35). Accordingly, as officers moved through the mall and

4

approached Sam's Jewelry Store, they "believed that there could possibly be an armed robbery and a gun was present." (*Id.* at 40). This is reflected in the following exchange at the hearing:

> "Q: So you take the information that you had when entering—when responding to the call, which was someone brandishing a weapon and having a black jacket and white Nike shoes; is that correct?
> A: That's correct.
> Q: And you saw someone matching that description; is that correct?
> A: That's correct.
> Q: And did that information collectively give you reasonable suspicion to detain the defendant?
> A: Yes, sir.

(*Id.* at 42).

## II. DISCUSSION

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "As the text makes clear, the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (internal quotation marks omitted). "[T]he Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971)). The government bears the burden of justifying a warrantless search. *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995).

### A. *Terry* Stop

The Fourth Amendment allows for brief investigative stops where an officer "has reasonable, articulable suspicion that [a] person has been, is, or is about to be engaged in criminal activity." *United States v. Hensley*, 469 U.S. 221, 227 (1985) (emphasis and internal quotation marks omitted). Moreover, protective frisks and pat-downs for weapons are authorized for officer

safety during a stop where, as here, officers have reason to believe that a suspect is armed. *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010) ("In order to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry."); *see also Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009) (*Terry v. Ohio* permits "stop and frisk" where investigatory stop is lawful and officer reasonably believes that suspect is "armed and dangerous"). The Court must analyze whether the officer's actions were initially justified, and whether "there [was] a reasonable relation between subsequent actions and the circumstances that supported the stop." *United States v. Vickers*, 540 F.3d 356, 360 (5th Cir. 2008).

Critically, though an officer's "mere hunch" is insufficient, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (citations and internal quotation marks omitted). Whether reasonable suspicion to stop exists is determined by "the facts known to the officer at the time." *Vickers*, 540 F.3d at 361. It is also "dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). The ultimate question is whether the "facts available to the officer . . . [would] warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).

Here, officers responded to the Cortana Mall because of two separate calls to police—one by a mall security guard and the other by an eyewitness. The determination of whether a 911 call has sufficient indicia of reliability to provide the necessary reasonable suspicion for a *Terry* stop is "evaluated based on the circumstances of each case." *Vickers*, 540 F.3d at 361. There is a presumption of reliability for "an eyewitness 911 call reporting an emergency situation." *Id.* (internal quotation marks omitted). The factors the Court must consider include:

> (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity or has instead gone stale.

*United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010).

The 911 caller's credibility and reliability was boosted as soon as officers saw a man matching the description provided over the phone in the mall. The information provided was specific—the witness described the suspect's race, gender, clothing, behavior, and explained that he had a gun. All of the information was later verified, as officers discovered a man matching this description with a gun in the same jewelry store a mall security guarded stated the suspect had just entered. Lastly, the tip concerned information that was not stale, but rather an actively developing and potentially dangerous situation for mall employees, customers, bystanders, and officers. Accordingly, the Fifth Circuit's *Gomez* factors clearly weigh in favor of a finding of reasonable suspicion.

Faced with the circumstances BRPD officers were at the Cortana Mall, the Court is hard-pressed to envision a scenario in which the reasonable officer would *not* have proceeded to the jewelry store and conducted a brief, investigatory stop of Smith. Even in the absence of probable cause that Smith had committed a specific crime, police had specific and presumptively reliable information that would lead them to believe a potentially dangerous and life-threatening situation could be unfolding in the mall at the minute they entered. Indeed, "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). This conclusion is buttressed by a host of factors: the fact that the suspect was allegedly seen "waving" a gun and discussing a robbery at the entrance to the mall, that his appearance matched the physical description provided by an eyewitness, that he was

7

located in a jewelry store (a store susceptible to being robbed), and his clear hesitation when told to put his hands in the air. Far from a "mere hunch," the officers had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). That he was armed and this criminal activity could have included an armed robbery and/or a shooting at a shopping mall created an emergency situation and necessitated immediate action by law enforcement.

In arguing that officers acted unreasonably, Smith relies in large part on the officers' subjective intent and beliefs, arguing that officers did not believe Smith had committed a crime or that they were conducting a *Terry* stop. (*See, e.g.*, Doc. 37 at 3 ("By his own admission, Officer Williams neither intended nor viewed officers' actions to be a *Terry* stop.")). But this is not the proper inquiry for a Fourth Amendment analysis. Instead, the Court must "ask whether the circumstances, viewed objectively, justify the challenged action." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 736 (2011) (internal quotation marks omitted). "If so, that action was reasonable *whatever* the subjective intent motivating the relevant officials," as "the Fourth Amendment regulates conduct rather than thoughts." *Id.* (citations and internal quotation marks omitted). Smith has presented no evidence that officers acted objectively unreasonably and is unable to overcome the host of facts justifying their actions.

Smith also characterizes the officers' actions as a full-blown arrest and not a *Terry* stop, an important distinction for Fourth Amendment purposes. While the line between the two can admittedly be thin,[2] a "relatively brief detention and patdown" can constitute a *Terry* stop and not an arrest where officers reasonably suspect that a person is armed and must accordingly take

---

[2] "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v United States*, 517 U.S. 690, 695 (1996) (internal quotation marks omitted).

"reasonable steps to protect himself during the detention." *United States v. Spencer*, 575 F. App'x 274, 276 (5th Cir. 2014). Indeed, the Fifth Circuit has held that "using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect––whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause." *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993). A contrary holding could create a dangerous and life-threatening situation for officers presented with a potentially armed suspect who have reasonable suspicion, but not probable cause, that the suspect has engaged or is about to engage in criminal activity.

Importantly, a court determining whether a *Terry* stop was "too long in duration to be justified as an investigative stop . . . should take care to consider whether the police are acting in a swiftly developing situation." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). "[I]n such cases, the court should not indulge in unrealistic second-guessing." *Id.* Officers here reasonably suspected Smith of being armed and possibly planning a robbery as he stood behind a jewelry store counter with two other men. That he did not immediately comply with the officers' directions to raise his hands only increased the urgency and potential danger of the situation. This is precisely the type of "swiftly developing situation" for which the Supreme Court in *Sharpe* cautioned against unrealistically second-guessing the actions of law enforcement. Accordingly, the Court concludes that the officers had reasonable suspicion of criminal activity and acted objectively reasonably in briefly detaining and patting down Smith before formally arresting him.

**B. Arrest**

Once officers discovered Smith's firearm and determined that he had been previously convicted of a felony, they arrested him. "[A] warrantless arrest satisfies the Constitution so long as the officer has 'probable cause to believe that the suspect has committed or is committing an

offense.'" *Virginia v. Moore*, 553 U.S. 164, 173 (2008) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). "'Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed.'" *United States v. Ned*, 637 F.3d 562, 567 (5th Cir. 2011) (quoting *United States v. Carrillo–Morales*, 27 F.3d 1054, 1062 (5th Cir. 1994)). "A determination of probable cause is also based on the totality of circumstances and must be predicated on more than a 'bare suspicion.'" *United States v. Guerra*, 605 F. App'x 295, 297 (5th Cir. 2015).

Here, officers arrested Smith after they discovered a handgun and learned that he had been convicted of a prior felony. Officer Williams testified that Smith was detained and patted down before officers found a handgun. (Tr. at 28). Smith urges that the entire process constituted an arrest because the body camera footage "shows a team of officers rushing into the jewelry store with guns drawn and ordering Mr. Smith to the ground." (Doc. 37 at 10). But, as the Court has just explained, a brief detention, use of force, verbal commands, and use of service weapons does not automatically turn a *Terry* stop into a formal arrest. *See Sanders*, 994 F.2d at 206. Officers were required to take such precautions because they were entering an unknown and patently dangerous situation with at least one person they reasonably believed was armed. As they formally arrested Smith only after discovering a firearm, identifying him, and learning of his status as a convicted felon, their arrest was supported by the requisite probable cause.

### III. CONCLUSION

Accordingly, for the foregoing reasons, **IT IS ORDERED** that the Motion to Suppress (Doc. 25) filed by David Jerome Smith is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>January 8, 2019</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**